IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| ALEX GREGORY, JR. and | * | Chapter 7 |
| DAWN GREGORY, | * | |
|     Debtors | * | |
| | * | Case No.: 1-01-bk-06000MDF |
| M&T BANK, | * | |
|     Plaintiff | * | |
| | * | |
| v. | * | Adv. No.: 1-04-ap-00093 |
| | * | |
| ALEX GREGORY, JR. and | * | |
| DAWN GREGORY, | * | |
|     Defendants | * | |
| | * | |

## OPINION

### Procedural and Factual History

Before me is the adversary complaint of M&T Bank ("M&T" or the "Bank") that seeks to deny the dischargeability of a debt to M&T owed by Alex Gregory, Jr. ("Debtor") as a guarantor of a commercial loan. The basis for M&T's claim of nondischargeability is found at 11 U.S.C. §523(a)(6), which bars the discharge of a debt incurred as a result of a "willful and malicious" injury inflicted by a debtor on the plaintiff.

M&T's complaint arises out of a lending transaction between the Bank and Down Under Steakhouse, Inc. (DUSH). Debtor was the president and treasurer of DUSH and an affiliated corporation, DUSH Hershey, Inc. ("DUSH Hershey"). In December 1999, DUSH entered into a Commercial Security Agreement (the "CSA") to obtain a $1 million loan from Keystone Financial Bank, N.A., the predecessor of M&T. The terms of the CSA provided that the loan was to be secured by a purchase money security interest in the restaurant equipment and other assets of DUSH. The CSA specifically prohibited the transfer of any collateral subject to the

security interest without M&T's consent and required the proceeds of any transfer to be conveyed to M&T even if M&T had not consented to the transfer. Debtor personally guaranteed payment on the promissory note that DUSH executed in conjunction with the CSA. At some unspecified date or dates thereafter, DUSH purchased a number of pieces of restaurant equipment[1] that were later moved to DUSH Hershey, which operated a restaurant at a strip mall owned by Cocoaplex Hospitality Group, LLC. ("Cocoaplex").[2]

In December 2001, Debtor entered into an agreement on behalf of DUSH Hershey to sell the Hershey operation to Cocoaplex for $40,000.00. Included in the sale was equipment that constituted M&T's collateral for its loan to DUSH.[3] At settlement on the sale, $32,321.44 was disbursed to pay DUSH Hershey's delinquent employee withholding taxes and sales taxes, which was a prerequisite to the transfer of the liquor license. Debtor was subject to a personal liability assessment for these delinquent taxes as an officer of DUSH Hershey. Debtor consummated the sale to Cocoaplex and used the proceeds to satisfy the tax liabilities rather than remitting the proceeds to M&T. The instant complaint was filed seeking a declaration that the $32,321.44 disbursed to the taxing authorities, rather than to M&T, is a nondischargeable debt under Section 523(a)(6) based upon Debtor's guarantee of the corporate obligations under the

---

[1]There is no direct evidence listing the specific pieces of equipment that were purchased with loan proceeds. However, one of M&T's exhibits included a listing of the equipment that was sold to Cocoaplex. Debtor did not challenge this exhibit or otherwise aver that any of the listed equipment was not subject to M&T's lien under the CSA.

[2]DUSH did not inform M&T that a transfer of this equipment to DUSH Hershey had taken place. Debtor testified that in fact there was no formal transfer executed between DUSH and DUSH Hershey regarding this equipment.

[3]The equipment that was sold included such items as the following: "(1) 48" Keating Grille, (3) fryers, (1) convection oven, (1) six burner stove with oven, (1) broiler, (1) walk-in freezer, (1) walk-in cooler, [and] (1) walk-in cooler room . . . ."

CSA. Debtor denies that he intended to convert the proceeds and deprive M&T of the satisfaction of its lien when he sold the equipment to Cocoaplex. He avers that it was his understanding that Cocoaplex was going to satisfy M&T's lien outside of settlement.

M&T filed a motion for summary judgment on its complaint and Debtor filed a cross motion for summary judgment. On February 11, 2005, the Court issued an Opinion and Order denying both the motion and the cross motion. A trial of this matter was held on August 10, 2005, and the matter was taken under advisement.[4]

### Discussion

Section 523(a)(6) provides that a debt is nondischargeable if it is "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The burden of proof in a case under 11 U.S.C. §523(a)(6) rests on the creditor/plaintiff. Fed. R. Bankr. Pro. 4005; *In re Graham,* 973 F.2d 1089, 1101 (3d Cir. 1992). The elements of "willfulness" and "maliciousness" are distinct, and each must be established by the plaintiff by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654 (1991); *In re Gagle*, 230 B.R. 174, 179 (Bankr. D. Utah 1999).

---

[4] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (I) and (O). This Opinion constitutes the findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

In *Kawaauhaus v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the Supreme Court clarified that in order for claim arising from an injury to be nondischargeable, the result of the act, not just the act itself, must be intended. Therefore, debts arising from reckless and negligent acts causing injury are dischargeable because the resulting harm is not intentional. *Id.* at 64. A determination that the *act* causing the injury was intentional is not enough to find the claim nondischargeable. The *injury* itself must have been intended. *In re Lahiri,* 225 B.R. 582, 586-87 (Bankr. E.D. Pa. 1998), *citing Geiger,* 523 U.S. at 61. *Geiger* does not define "malicious," but the injury must be attributable to both willfulness and malice. Malice in the Third Circuit has been defined as an action that is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *In re Conte*, 33 F.3d 303, 308 (3d Cir. 1994); *See, also, Tinker v. Colwell*, 193 U.S. 473, 486, 24 S.Ct. 505, 505, 48 L. Ed. 754 (1904) (legal malice defined as "a wrongful act, done intentionally, without just cause or excuse"); *In re Gagle*, 230 B.R. at 180, fn.9 (collecting post-*Geiger* cases incorporating *Tinker* definition of malice). Under these standards, the dispositive issue in the instant case is whether Debtor acted with the purpose of injuring M&T when he sold its collateral without M&T's approval and without satisfying the lien and, further, whether these acts were wrongful and without just cause.

In satisfaction of its burden of proof, M&T produced a copy of the CSA, which stated that DUSH could not "sell, offer to sell, or otherwise transfer or dispose of the [equipment]." The CSA further required DUSH to hold proceeds of any sale of the collateral in trust for M&T and to immediately deliver such proceeds to the bank. M&T adduced testimony from the Debtor that he had read the CSA prior to signing it, thus indicating that he had knowledge that DUSH was prohibited from transferring the equipment without M&T's prior consent. Debtor further

4

testified that he made no effort to inform M&T about the sale, let alone obtain its consent, either prior to or after the sale's consummation. The settlement sheet on the sale records that the equipment was sold for $40,000.00, and that $32,321.44 was disbursed to pay "encumbrances - taxes." The remaining balance of the sale proceeds ($7,678.56) apparently was disbursed to DUSH.[5]

Debtor avers that he did not intend to injure M&T. He testified that during the course of the negotiations leading up to the sale he understood that Cocoaplex would "take care of" M&T's lien. He testified that he had several discussions with at least one of the principals of Cocoaplex, Glen Sponaugle ("Sponaugle"), and that Sponaugle gave him the impression that Cocoaplex would satisfy the lien outside of settlement. Debtor testified that he relied on this impression throughout the period leading up to the sale and felt it absolved him from informing M&T about the transaction, notwithstanding the requirements of the CSA. Curiously, neither party called Sponaugle to testify. Without his testimony to corroborate or refute that of the Debtor, the Court is left to weigh the Debtor's self-serving statements against the indirect evidence adduced by M&T on the issue of Debtor's intent. That an experienced businessman like Debtor would have acted with such cavalier disregard for his obligations under the CSA is suspect. However, Debtor's testimony was not effectively impeached or otherwise refuted by M&T. The Bank's case chiefly rested on the uncontradicted evidence that Debtor never notified M&T of the pending sale. Although this evidence suggests that Debtor intended to harm M&T,

---

[5]The settlement sheet stated that the balance was "Due DUSH." No evidence was presented as whether DUSH actually received this sum. While there is no evidence that it was paid to M&T pursuant to the sale, M&T does not seek in the instant adversary to obtain a declaration of nondischargeability as to this amount.

5

it also can be interpreted as simply reckless and negligent. This Court cannot rely alone on the evidence that the CSA restricted DUSH's ability to sell the equipment and that Debtor knew of this restriction to support the conclusion that Debtor intended to harm M&T when he sold the property without the Bank's permission and without satisfying its lien.

"The mere conveyance of property encumbered by [a] security interest does not itself constitute malicious injury." *In re Homschek*, 216 B.R. 748, 754-55 (Bankr. M.D. Pa. 1998) (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393, 396 (1934), *In re Pugliese,* 211 B.R. 173 (Bankr. M.D. Pa. 1997), *In re Horldt,* 86 B.R. 823, 827 (Bankr. E.D. Pa. 1988). In *Pugliese*, a debtor had purchased various computer, television and stereo equipment from Sears on a credit card issued by Sears. The terms of the credit card agreement included a provision that the card holder granted Sears a security interest in any items purchased with the card. After losing his job, debtor Pugliese sold some of the equipment purchased with the credit card, but did not notify Sears of these sales nor remit the proceeds to Sears. When Pugliese filed his bankruptcy petition, Sears objected to the dischargeability of its debt under Section 523(a)(6), arguing that the sale of the equipment constituted a willful and malicious injury. The Court held that Sears did not satisfy its burden of proving that Pugliese intended to harm Sears by selling the equipment, even though Sears showed that he sold it to buy drugs. The Court found that Pugliese's continued payments to Sears during the period in which the equipment was sold refuted the implication that he intended to harm Sears by not paying for the equipment. Similarly, in the instant case, Debtor's testimony that he believed that M&T's security interest would be satisfied from funds other than the proceeds of the sale to Cocoaplex rebuts the implication that Debtor intended to harm M&T by failing to remit the proceeds of the

6

sale to satisfy its security interest.  At best, M&T has shown that Debtor acted maliciously – that he committed a wrongful act without just cause or excuse.  However, M&T has failed to establish that Debtor acted willfully as defined by *Geiger* (i.e., he intended to cause harm).

In its Complaint, M&T cites the case of *In re Brouillet,* 138 B.R. 338, 340 (D. Mass. 1992) for its finding of nondischargeability under Section 523(a)(6) against the principal of a construction business who caused the business to pay employees and taxes with receivables that were the lender's cash collateral.  The business had received these funds a few weeks after a meeting with the lender in which the parties had discussed a workout of the business's defaults on its loan.  The Court held that even though it found that the debtor did not pay the employees and taxes with the specific intent of harming the lender, the debt was nonetheless nondischargeable.  The Court reasoned that "because the conversion was done deliberately and intentionally in knowing disregard of the rights of another," it was done with malice as defined by the First Circuit at that time.  *Id.* at 340 (citing *In re Nance,* 552 F.2d 602 (1977)).  Clearly, *Brouillet,* a decision rendered before *Geiger*, is no longer good law because the Supreme Court has ruled that a specific intent to harm the plaintiff is required.  Again, the defendant must intend to injure the plaintiff; a wrongful, intentional act is not enough to establish nondischargeability.  Therefore, even though M&T has shown that Debtor knew of its security interest in the equipment at the time it was sold, M&T has failed to satisfy its burden of proving that Debtor intended to injure the bank by selling its collateral.

7

An order to granting judgment in favor of Debtor and denying M&T's objection to the dischargeability of its claim will be entered.

BY THE COURT,

*/s/ Mary D. France*
Bankruptcy Judge

Date: December 28, 2005

*This electronic opinion is signed and filed on the same date.*